1

2

3

4

5

IN THE UNITED STATES DISTRICT COURT

6

FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8

RESHMA KAMATH,

Case No.  23-cv-03533-CRB

9

Plaintiff,

10

v.

**ORDER GRANTING MOTION TO COMPEL ARBITRATION**

11

COINBASE, INC., et al.,

12

Defendant.

13

Plaintiff Reshma Kamath has sued Defendants Coinbase, Inc. and Wells Fargo

14

Bank, N.A. for damages relating to an allegedly fraudulent transaction whereby a client

15

gave Plaintiff a fraudulent check that Plaintiff deposited into her Wells Fargo bank account

16

and thereafter transferred, via Coinbase,[1] to an unknown third party, at the behest of the

17

client—resulting in a loss of $35,000[2] worth of Bitcoin.  See Compl.  Coinbase has moved

18

to compel arbitration and to dismiss under Rule 12(b)(1) of the Federal Rules of Civil

19

Procedure, or, in the alternative, to stay proceedings.  See Mot.

20

21

[1] Coinbase is an online platform for buying, selling, transferring, and storing cryptocurrency.  See

22

Mot. (dkt. 17) at 3.  Cryptocurrency "like Bitcoin, . . . is not issued by a government or a central bank; it is created by developers and traded over the internet." Bielski v. Coinbase, Inc., 87 F.4th

23

1003, 1007 (9th Cir. 2023).  Because many traditional investment firms and banks do not sell cryptocurrency, many people buy and sell it through cryptocurrency exchanges.  See id.  Coinbase

24

is one of these exchanges; it provides users with a digital wallet, which they fund with money from their personal bank account.  Id.  Users can store currency and transfer it in and out of their

25

digital wallet.  Id.
[2] Plaintiff makes several seemingly conflicting assertions regarding her monetary loss as a result

26

of this incident.  The damages Plaintiff seeks range from "$100,000 of crypto[currency]" to "over a million dollars of crypto[currency]."  See Opp'n (dkt. 27) at 8; Compl. (dkt. 1) at 7.  However,

27

Plaintiff told Coinbase—via Coinbase's "Complaint Referral Form Internet Crime Complaint Center"—that she made three Bitcoin transactions to a third party, totaling $35,000 in United

28

States dollars.  See Compl. Ex. B.  In any event, the precise monetary loss is not material to this order.

United States District Court
Northern District of California

The Court finds that these motions are suitable for resolution without oral argument or further briefing, pursuant to Civil Local Rule 7-1(b).  As explained below, the Court VACATES the hearing currently set for March 8, 2024, GRANTS Coinbase's motion to compel arbitration, and STAYS this suit pending arbitration.

## I.    BACKGROUND

Coinbase operates an online platform for buying, selling, and transferring cryptocurrencies like Bitcoin, the cryptocurrency at the center of Plaintiff's claims.  See Nacoste Decl. (dkt 17-2) ¶ 2.  Coinbase provides its online platform and services to its users under the terms of a Coinbase User Agreement (UA).  Id. ¶ 7.  To create an account and use Coinbase's services, prospective users must expressly assent to be bound by the UA.  Id.

### A.    Agreement to the UA

Coinbase maintains a log of activities taken by Coinbase users.  Id. ¶ 6.  Coinbase's records reflect that Plaintiff created a Coinbase account and accepted the Coinbase UA on June 9, 2017.  Id. ¶ 10, Ex. A.  The 2017 UA contained an arbitration provision that provided that Coinbase "may amend or modify this agreement by posting on the Coinbase Site or emailing to [the user] the revised Agreement, and the revised Agreement shall be effective at such time."  Id. Ex. B § 8.5.  Coinbase periodically updates the terms of its UA.  See Mot. at 3.  Before the 2022 UA became active, Coinbase emailed Plaintiff on January 25, 2022, to inform her that Coinbase would be updating its UA the following week.  See Nacoste Decl. Ex. C.  The email explained that if she wanted to continue using her account, she would need to accept the updated 2022 UA.  See id.  The email provided a hyperlink to the full terms of the updated UA and encouraged users to "make sure [to] read the updated User Agreement."  Id.  The email also flagged the 2022 UA's arbitration clause.  Id. ("We've reorganized and modified our User Agreement to make it more understandable to [the user] and in line with our culture of clear communications.").

The 2022 UA was programmed to appear when users logged into their accounts in February 2022.  See Zia Decl. (dkt. 17-3) § 6.  After the user inputted their account

credentials, the user was routed to a landing page that announced the update.  See id.  The landing page presented a scroll-box containing the full text of the 2022 UA.  Id. Ex. B. Above the scroll box was a directive to "review and accept [the] updated terms and conditions to continue using [their] Coinbase account."  Id.  Users could accept the terms of the 2022 UA by clicking a blue "[a]ccept terms" button at the bottom of the page.  Id. § 10.

Coinbase's records reveal that Plaintiff accepted the updated UA on February 28, 2022.  See Nacoste Decl. ¶ 16, Ex. D.

**B.   Arbitration Provisions**

The 2022 UA included the following arbitration provision:

> **1.1 Applicability of Arbitration Agreement.** Subject to the terms of this Arbitration Agreement, you and Coinbase agree that any dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or the Coinbase Site, any Communications you receive, any products sold or distributed through the Coinbase Site, the Services, or the User Agreement and prior versions of the User Agreement, including claims and dispute that arose between us before the effective date of these terms (each, a "**Dispute**") will be resolved by binding arbitration, rather than in court, except that: (1) you and Coinbase may assert claims or seek relief in small claims court if such claims qualify and remain in small claims court; and (2) you or Coinbase may seek equitable relief in court for infringement, or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents). For purposes of this Arbitration Agreement, "Dispute" will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the User Agreement as well as claims that may arise after the termination of this User Agreement.

Id. Ex. E at Appendix 5 (emphasis in original).

The 2022 UA also contained a jury trial waiver:

> **1.2. Waiver of Jury Trial. <u>YOU AND COINBASE HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY</u>. You and Coinbase are instead electing that all Disputes shall be resolved by arbitration under this Arbitration Agreement, except as specified in the subsection entitled "Applicability of Arbitration Agreement" above. There is no judge or jury in arbitration, and court review of an arbitration award is subject to very limited review.**

1    Id. (emphasis in original).

2         The Preamble of the 2022 UA contained the following language:

3              **Dispute Resolution: PLEASE BE AWARE THAT
               SECTION 7 (CUSTOMER FEEDBACK, QUERIES,**
4              **COMPLAINTS AND DISPUTE RESOLUTION) AND
               APPENDIX 5 OF THIS AGREEMENT, CONTAIN**
5              **PROVISIONS GOVERNING HOW TO RESOLVE
               DISPUTES BETWEEN YOU AND COINBASE. AMONG**
6              **OTHER THINGS, APPENDIX 5 INCLUDES AN
               AGREEMENT TO ARBITRATE WHICH REQUIRES,**
7              **WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES
               BETWEEN YOU AND US SHALL BE RESOLVED BY**
8              **BINDING AND FINAL ARBITRATION. APPENDIX 5
               ALSO CONTAINS A CLASS ACTION AND JURY TRIAL**
9              **WAIVER. PLEASE READ SECTION 7 AND APPENDIX
               5 CAREFULLY.**

10   Id. at Preamble. (emphasis in original).

11        Finally, the 2022 UA contained a delegation provision giving the arbitrator

12   exclusive authority to determine the enforceability of the arbitration agreement:

13            **1.6. Authority of Arbitrator.** The arbitrator shall have
14            exclusive authority to resolve any Dispute, including, without
              limitation, disputes arising out of or related to the interpretation
15            or application of the Arbitration Agreement, including the
              enforceability, revocability, scope, or validity of the Arbitration
16            Agreement or any portion of the Arbitration Agreement[.]

17   Id. (emphasis in original).

18   **II.    LEGAL STANDARD**

19        Contracts "evidencing a transaction involving commerce" are subject to the Federal

20   Arbitration Act ("FAA").  See Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126,

21   1130 (9th Cir. 2000) (citing 9 U.S.C. § 2).  The FAA provides that an agreement to

22   arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at

23   law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "[A]ny party bound to

24   an arbitration agreement that falls within the scope of the FAA may bring a motion in

25   federal district court to compel arbitration."  Magana v. DoorDash, Inc., 343 F. Supp. 3d

26   891, 898 (N.D. Cal. 2018) (citing 9 U.S.C. §§ 3–4).

27        When deciding whether to compel arbitration under the FAA, a court's role is

28   "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2)

United States District Court
Northern District of California

4

whether the agreement encompasses the dispute at issue." <u>Chiron Corp.</u>, 207 F.3d at 1130. If the answer to both questions is "yes," the court must enforce the arbitration agreement. <u>See id.</u> "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . apply ordinary state-law principles that govern the formation of contracts." <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995).

## III.    DISCUSSION

Coinbase argues primarily that the parties agreed to delegate the issue of arbitrability to the arbitrator. <u>See</u> Mot. at 8. Plaintiff counters that the Court, not an arbitrator, must decide the issue of arbitrability, that Plaintiff did not unambiguously manifest assent to Coinbase's 2022 UA, and that even if she did, the arbitration agreement is unconscionable and therefore unenforceable. <u>See</u> Opp'n at 2–3. This order will discuss (A) the issue of contract formation; (B) the issue of arbitrability; (C) Plaintiff's assertion of unconscionability; and (D) Coinbase's stay request.

### A.    Contract Formation

Plaintiff argues that she did not assent to the UA and therefore that no contract was ever formed. <u>See id.</u> at 16. The Court will decide this issue rather than letting the arbitrator decide it. <u>See</u> <u>Belyea v. GreenSky, Inc.</u>, No. 20-cv-1693-JCS, 2020 WL 3618959, at *3 (N.D. Cal. July 2, 2020) ("The question of contract formation, however, is not a delegable gateway issue.") (quoting <u>Kum Tat Ltd. v. Linden Ox Pasture, LLC</u>, 845 F.3d 979, 983 (9th Cir. 2017) ("[a]lthough challenges to the validity of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very existence of the contract are, in general, properly directed to the court."); <u>Galilea, LLC v. AGCS Mar. Ins. Co.</u>, 879 F.3d 1052, 1056 (9th Cir. 2018) (courts "must first make a threshold finding that the document [evidencing an agreement] at least purports to be . . . a contract") (internal quotation marks omitted).

As the party seeking to compel arbitration, Coinbase "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." <u>Lopez v.</u>

United States District Court
Northern District of California

Dave Inc., No. 22-cv-4160-VC, 2022 WL 17089824, at *1 (N.D. Cal., Nov. 21, 2022) (internal quotation marks omitted).  "Arbitration is a matter of contract."  Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014) (internal quotation marks omitted). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  Id. at 565 (internal quotation marks omitted).  "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation."  Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 856 (9th Cir. 2022).  The parties here appear to agree that California law governs.  See Mot. at 9; Opp'n at 3.  The 2022 UA has a provision stating the same.  See Nacoste Decl. Ex. E § 9.5 ("**Governing Law.** You agree that the laws of the State of California . . . will govern this dispute . . . ") (emphasis in original).

Plaintiff argues that Coinbase's landing page did not provide reasonably conspicuous notice of Coinbase's terms of service or its arbitration provision and that Plaintiff did not manifest assent to either.  See Opp'n at 14–16.[3]  These are indeed the two issues the Court must address.  See Sellers v. JustAnswer LLC, 73 Cal. App.5th 444, 466–71 (2021) (holding that the sign-in wrap at issue was not sufficiently conspicuous to bind consumers to the contract); see also Berman, 30 F.4th at 856 ("[A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.") (citing Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017); Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1173 (9th Cir. 2014)).

There was conspicuous notice here.  To open a Coinbase account, Plaintiff had to

---

[3] Plaintiff contends that the 2022 UA is a "browsewrap" and a "sign-in wrap," Opp'n at 8, 12, while Coinbase contends that it is a "clickwrap agreement."  Reply (dkt. 29) at 3.  Even assuming that the UA agreement could be both a "browsewrap" and a "sign-in wrap" (it cannot), the Court is inclined to agree with Coinbase on this matter, as users must click that they agree to the UA.  See Zia Decl. ¶ 10.  The precise label does not matter; so long as the agreement gave reasonably conspicuous notice and Plaintiff manifested assent, there was an agreement.

accept the 2017 UA, which alerted users that Coinbase could "amend or modify" the agreement by posting on the Coinbase website or sending an email to the user.  Nacoste Decl. Ex. B § 8.5.  Plaintiff does not argue that she did not assent to the 2017 UA; rather, Plaintiff argues that she did not assent to the updated 2022 UA.  See Opp'n at 16.  Plaintiff was first informed of the 2022 UA on January 25, 2022, when Coinbase emailed her about the upcoming changes to the UA.  See Nacoste Decl. ¶14.  The email was concise, providing only a handful of bullet points for users to read.  See id. Ex. C.  One of the bullet points specifically flagged the UA's arbitration clause: "**Clarity on Dispute Resolution:** We've revised our arbitration to streamline the process for resolving problems you may experience."  Id.  (emphasis in original).  The email also provided a hyperlink to the full terms of the updated UA and encouraged users to "make sure [to] read the entire agreement."  Id.

The email and Plaintiff's continued use of Coinbase's services is enough to establish reasonably conspicuous notice and assent to the terms of the 2022 UA.  See Sadlock v. Walt Disney Co., No. 22-CV-09155-EMC, 2023 WL 4869245, at *12 (N.D. Cal. July 31, 2023) (holding user unambiguously manifested assent to a subscriber agreement by continuing to use website following an email of the update to the terms and conditions); In re Facebook Biometric Info. Priv. Litig., 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (concluding that email regarding updates to the user agreement and continued use is enough for notice and assent); In re Uber Techs., Inc., No. ML 18-2826 PSG (GJSx), 2019 WL 6317770, *4 (C.D. Cal. Aug. 19, 2019) ("Courts have found that when consumers receive emails such as this one [e.g., having a subject line stating that Uber had updated its terms of use, including in the body that the arbitration agreement had been revised, and providing a link to the updated terms], continued use of the service or product constitutes assent to the updated terms"); West v. Uber Techs., No. 18-CV-3001-PSG-GJS, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) (stating the same).

Plaintiff here received even more notice than a single email.  See Zia Decl. Ex. B. When Plaintiff attempted to log into her account in February 2022, she was routed to a

1   landing page.  Id.  The landing page had the following phrases in bold and in a larger font

2   size than the rest of the text on the page: "We're updating your User Agreement with

3   Coinbase" and "Coinbase User Agreement."  Id.  Underneath the bold text was a scroll box

4   containing the full text of the 2022 UA.  Id.  The landing page also informed users that

5   they could access a summary of the changes by clicking a hyperlink that directed them to

6   an article that depicted those changes.  See id.  Coinbase's landing page was therefore

7   conspicuous and varies from the notice in Berman, where the link to the terms and

8   conditions to which the user allegedly agreed was "printed in a tiny gray font considerably

9   smaller than the font used in the surrounding website elements . . . barely legible to the

10  naked eye."  30 F.4th at 856–57.

11          Plaintiff's unambiguous assent to the 2022 UA is further illustrated by her conduct

12  of clicking Coinbase's "[a]ccept terms" button.  See Zia Decl. Ex. C.  At the bottom of the

13  landing page was a bright blue button that users needed to click to accept the terms of the

14  UA in order to continue to use Coinbase services.  See id. Ex. B ¶ 10.  The blue button had

15  the following text inside it in bold and white font: "Accept terms."  See id.  That text put

16  Plaintiff on notice.  See Peter v. DoorDash, Inc., 445 F. Supp. 3d 580, 586 (N.D. Cal.

17  2020) (plaintiffs on notice where "text contrasts clearly with the background and is plainly

18  readable").  Near the "[a]ccept terms" button was a statement informing users to "[p]lease

19  review and accept your updated terms and conditions to continue using your Coinbase

20  account."  Zia Decl. Ex. B.  Coinbase's records indicate that Plaintiff clicked the button on

21  February 28, 2022, and continued to access her Coinbase account.  Id. Ex. C.  Coinbase's

22  landing page is far superior to the websites in Berman and Sellers, which did not state that

23  clicking the "[c]ontinue" button manifested assent to the terms and conditions.  See

24  Berman, 30 F.4th at 858 ("This notice defect could easily have been remedied by including

25  language such as, 'By clicking the Continue >> button, you agree to the Terms &

26  Conditions.'"); Sellers, 73 Cal. App.5th at 453 (consumer clicked "[s]tart my trial" and

27  only "in very small print further down the page" did the webpage state: "'By clicking

28  'Start my trial' you indicate that you agree to the terms of service and are 13+ years

United States District Court
Northern District of California

old.'").

Plaintiff argues that she did not manifest assent because she did not physically sign the 2022 UA.  See Opp'n at 11.  Plaintiff also argues that Coinbase needed to provide her with a "detailed application" and was required to "collect . . . [her] personal information" for her electronic signature to be authentic.  Id. at 17–18.  Plaintiff cites no authority for these assertions.  Plaintiff's affirmative act of clicking "[a]ccept terms" qualifies as an electronic signature under federal and California law because it is "an electronic sound, symbol, or process . . . adopted by a person with the intent to sign the record."  15 U.S.C. § 7006(5); see Cal. Civ. Code § 1633.2(h) ("electronic signature" means an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.").  Further, this Court has recognized that "[e]lectronic signatures and clicking "[a]ccept" are valid means of expressing assent to a contract."  Mikhah v. University of Phoenix, No. C16-00901 CRB, 2016 WL 3401763, at *6 (N.D. Cal. June 21, 2016) (citing Cal Civ. Code § 1633.7(b)).

Accordingly, Plaintiff agreed to the 2022 UA.  See Alfia v. Coinbase Global, Inc., No. 21-cv-8689-HSG, 2022 WL 3205036, at *2 (N.D. Cal. July 22, 2022) (holding, where "Plaintiff had to click a 'check box' next to the language 'I certify that I am 18 years of age or older, and I agree to the User Agreement and Privacy Policy,' with both agreements accessible via hyperlink," that plaintiff had "clear notice . . . and took physical action to manifest his assent.").

**B.   Arbitrability**

Plaintiff argues that the Court must determine whether a valid arbitration exists before referring the dispute to the arbitrator.  See Opp'n at 2.  Therefore, the Court will next address whether it may resolve gateway issues of arbitrability or whether an arbitrator must resolve those issues.

**1.   Governing Law**

To determine who decides the question of arbitrability, the Court must first address

United States District Court
Northern District of California

the applicable law that governs the dispute.  "[F]ederal law governs the arbitrability question by default because the Agreement is covered by the FAA" except where the parties have "clearly and unmistakably designated that nonfederal <u>arbitrability</u> law applies."  <u>Brennan v. Opus Bank</u>, 796 F.3d 1125, 1129 (9th Cir. 2015) (emphasis in original).  The 2022 UA does not explicitly state whether California or federal law governs the question of arbitrability.  <u>See</u> Nacoste Decl. Ex. E § 9.5.  Because there is ambiguity as to whether the question of arbitrability is governed by California law, there is not "clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law."  <u>See</u> <u>Shierkatz RLLP v. Square, Inc.</u>, No. 15-cv-02202-JST, 2015 WL 9258082, at *5 (N.D. Cal. Dec. 17, 2015) (citing <u>Brennan</u>, 796 F.3d at 1129); <u>see also</u> <u>Cape Flattery Ltd.</u>, 647 F.3d at 921 (holding that "courts should apply federal arbitrability law absent 'clear and unmistakable evidence' that the parties agreed to apply non-federal arbitrability law.") (citing <u>Kaplan</u>, 514 U.S. at 944).  Therefore, the Court applies federal arbitrability law.

## 2.     Clear and Unmistakable Delegation

The "gateway" question of arbitrability asks "whether the parties have submitted a particular dispute to arbitration."  <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83 (2002).  The parties can agree that this question, like any other, will be decided by an arbitrator.  <u>See</u> <u>Rent-A-Ctr., West, Inc. v. Jackson</u>, 561 U.S. 68–69 (2010); <u>see also</u> <u>Henry Schein, Inc. v. Archer & White Sales, Inc.</u>, 139 S. Ct. 524, 530 (2019) ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.").  Courts should presume that they determine arbitrability "'[u]nless the parties clearly and unmistakably provide otherwise.'"  <u>Howsam</u>, 537 U.S. at 83 (quoting <u>AT&T Techs., Inc. v. Commc'ns Workers</u>, 475 U.S. 643, 649 (1986)).  Clear and unmistakable evidence can be "a course of conduct demonstrating assent . . . or . . . an express agreement."  <u>Momot v. Mastro</u>, 652 F.3d 982, 988 (9th Cir. 2011) (omissions in text).  Silence or ambiguity must be construed in favor of the court deciding the issue of arbitrability.  <u>Kaplan</u>, 514 U.S. at 945–47.

Coinbase here argues that the 2022 UA's delegation provision unmistakably

delegates arbitrability questions to the arbitrator.  See Mot. at 12.  There is support in the case law for that position.  Other courts have found that Coinbase's arbitration provision has clearly and unmistakably delegated arbitrability to an arbitrator.  See, e.g., Aggarwal v. Coinbase, No. 22-CV-04829-JSW, 2023 WL 4935003, at *8 (N.D. Cal. Aug. 2, 2023) (interpreting Coinbase's 2022 UA and concluding that "the parties clearly and unmistakably agreed to submit arbitrability issues to an arbitrator."); Donovan v. Coinbase Globe., Inc., 649 F. Supp. 3d 946, 954 (N.D. Cal. 2023) (same);  Flores v. Coinbase, Inc., No. CV 22-8274-MWF (KS), 2023 WL 3564756, at *1 (C.D. Cal. Apr. 6, 2023) (same). And only a few months ago, the Ninth Circuit held that a substantially similar delegation clause in an earlier version of Coinbase's UA was not unconscionable and required that threshold disputes be resolved by an arbitrator.  See Bielski, 87 F.4th at 1015.

A recent Ninth Circuit ruling further supports the delegation here.  See Patrick v. Running Warehouse, LLC, No. 22-56078, 2024 WL 542831, at *8 (9th Cir. Feb. 12, 2024).  In Patrick, the delegation provision was attached to a "terms of use" hyperlink.  Id. at 2.  When consumers were in the process of creating an account, they had to check a box next to a statement that informed them that by creating an account, they were agreeing to the "terms of use."  Id.  The court found that the following delegation provision clearly and unmistakably delegated questions of arbitrability to the arbitrator, explaining:

> [J]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought and who are the proper parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

Id. at 7.

Given the similarity of the Patrick delegation provision to the delegation provision here, the Court concludes that Coinbase's delegation provision clearly delegated arbitrability to the arbitrator.  See id.

Plaintiff fails to persuade the Court that the delegation provision is unenforceable.

1 While Plaintiff references the "clear and unmistakable" standard for delegation in her

2 opposition, see Opp'n at 21, she fails to articulate why Coinbase does not meet it.  It is

3 unclear to this Court why Coinbase's alleged "false attestations" regarding discovery and

4 Plaintiff's desire to "engage in arbitration **concurrently** together with this federal case" is

5 relevant to whether the delegation provision is enforceable.  Id. at 22.  (emphasis in

6 original).  Plaintiff goes on to cite Burzdak v. Universal Screen Arts, Inc., No. 21-CV-

7 02148-EMC, 2021 WL 3621830, at *1 (N.D. Cal. Aug. 16, 2021)—a case that held that a

8 browsewrap agreement did not put a reasonably prudent website user on inquiry notice.

9 See id. at 23.  Burzdak's holding turned on contract formation, not the enforceability of a

10 delegation provision, so it is not relevant to this issue.  See id.

11      Accordingly, the Court holds that the parties clearly and unmistakably delegated

12 questions of arbitrability to an arbitrator.

13      **C.      Unconscionability and Specificity**

14      Next, the Court must assess whether a general contract principle—here, the

15 principle against enforcing unconscionable agreements—makes the delegation clause

16 unenforceable under the FAA.  See Rent-A-Center, 561 U.S. at 71–74.

17      Courts may refuse to enforce an unconscionable contract or a specific clause within

18 a contract, or they may limit the application of any unconscionable clause.  See Cal. Civ.

19 Code § 1670.5(a).  "California's 'unconscionability standard is, as it must be, the same for

20 arbitration and nonarbitration agreements.'"  Poublon v. C.H. Robinson Co., 846 F.3d

21 1251, 1260 (9th Cir. 2017) (quoting Sanchez v. Valencia Holding Col, LLC, 61 Cal. 4th

22 899, 912 (2015)).

23      "[T]he party opposing arbitration bears the burden of proving . . .

24 unconscionability."  Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC, 55

25 Cal. 4th 223, 236 (2012).  That party "must demonstrate that the contract as a whole or a

26 specific clause in the contract is both procedurally and substantively unconscionable."

27 Poublon, 846 F.3d at 1260.  Procedural unconscionability and substantive

28 unconscionability "need not be present in the same degree."  Id.  (quoting Sanchez, 61 Cal.

12

4th at 910). Instead, "there is a sliding scale." Id. "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." Sanchez, 61 Cal. 4th at 910.

The Ninth Circuit recently held that "to sufficiently challenge a delegation provision [on unconscionability grounds, for example], the party resisting arbitration must specifically reference the delegation provision and make arguments challenging [its unconscionability]." Bielski, 87 F.4th at 1011. "[A] party may use the same arguments to challenge both the delegation provision and arbitration agreement, so long as the party articulates why the argument invalidates each specific provision." Id. The rule is consistent with the approach in the Second, Third, and Fourth Circuits where if "a party's challenge mentions and specifically relates to the validity of the delegation provision in its opposition[,] . . . the federal court has a green light to consider those arguments." Id.

Plaintiff's unconscionability challenge to the delegation provision is scant—she argues that there is a "high degree" of procedural and substantive unconscionability, but her only support for that assertion is that Coinbase failed to obtain her "informed written consent." Opp'n. at 20–21. Because there is a "low barrier to entry" to federal court for unconscionability challenges, this Court will consider the procedural and substantive unconscionability of Coinbase's delegation provision. See Bielski, 87 F.4th at 1010.

### 1.    Procedural Unconscionability

A determination of procedural unconscionability involves the analysis of two factors: (1) oppression; and (2) surprise. Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1280 (9th Cir. 2006). Oppression is found when there is such an inequality in bargaining power between two parties that there is no actual negotiation and a lack of meaningful choice. Id. Surprise is found when the "supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." Id. (internal quotation marks omitted).

Here, the delegation provision is minimally procedurally unconscionable. Plaintiff

1    makes no arguments about why the delegation provision is procedurally unconscionable.

2    She does not, for example, contend that she was an "unsophisticated layperson[s] who

3    could not have understood the delegation agreement." See Pinela v. Neiman Marcus Grp.,

4    238 Cal. App. 4th 227, 243 (2015).  Thus, at most, there is only "the minimum degree of

5    procedural unconscionability that is always present with an adhesive contract." Id. at 244.

6    And because "the degree of procedural unconscionability . . . is low . . . the agreement will

7    be enforceable unless the degree of substantive unconscionability is high." See Poublon,

8    846 F.3d at 1263 (citation omitted).

9                            **2.    Substantive Unconscionability**

10        Substantive unconscionability occurs when the terms of the agreement are one-

11    sided.  See Little v. Auto Stiegler, Inc., 29 Cal.4th 1064, 1071 (2003).  A court will refuse

12    to enforce an agreement, rather than sever the offending unconscionable provision, where

13    the agreement is "permeated" with unconscionability.  Armendariz v. Found. Health

14    Psychcare Servs., Inc., 24 Cal.4th 83, 122 (2000).

15        Plaintiff's only argument on substantive unconscionability is that Coinbase failed to

16    obtain her "informed written consent," but Plaintiff offers no legal support for why

17    "written" consent is required. See Opp'n at 21.  Coinbase's records show that Plaintiff

18    assented to the 2022 UA by providing her electronic signature when she clicked on a

19    clicked on a conspicuous "[a]ccept terms" button.  See Zia Decl. ¶ 12, Ex. C.  Plaintiff was

20    informed that by clicking the button, she was accepting to the terms and conditions of the

21    2022 UA.  See id. ¶ 7.  That is sufficient to demonstrate consent.  See Berman 30 F.4th at

22    857 ("user's click of a button can be construed as an unambiguous manifestation of assent

23    only if the user is explicitly advised that the act of clicking will constitute assent to the

24    terms and condition of an agreement.")

25        The delegation agreement is therefore (at most) minimally procedurally

26    unconscionable and is not substantively unconscionable.  Under the "sliding scale"

27    approach, see Poublon, 846 F.3d at 1260, it is valid and enforceable.  Accordingly, the

28    Court concludes that the parties entered into a valid agreement and that that agreement

United States District Court
Northern District of California

14

delegates the question of arbitrability to the arbitrator.  The Court GRANTS the motion to compel.

### D.     Stay

Coinbase requests that this Court dismiss this case under Rule 12(b)(1), or, in the alternative, stay this action pending completion of arbitration proceedings.  See Mot. at 16. Motions to compel arbitration are generally treated as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).  See Harris v. Pac. Gas & Elec. Co., No. 21-CV-04096-JCS, 2022 WL 16637987, at *6 (N.D. Cal. Nov. 2, 2022).

The FAA provides that

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, **shall on application of one of the parties stay the trial of the action** until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 2 (emphasis added).  The plain language of the statute suggests that the Court "shall" stay the action pending arbitration.  See Johnmohammadi v. Bloomingdale's Inc., 755 F.3d 1072, 1074 (9th Cir. 2014); Magana v. DoorDash, Inc., 343 F. Supp. 3d 891, 902 (N.D. Cal. 2018) (applying plain language of the statute to hold that a "stay" is required); Lloyd v. HOVENSA, LLC., 369 F.3d 263, 269 (3d Cir. 2004) (same); see also Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 88 (2000) (applying "the plain language of the statutory text" in interpreting the FAA).

The Ninth Circuit, however, has held that "notwithstanding the language of § 3, a district court may either stay the action or dismiss it outright when, as here, the court determines that all of the claims raised in the action are subject to arbitration." Johnmohammadi, 755 F.3d at 1073–74.  Coinbase offers no support for why the Court should depart from the plain language of the text.  Accordingly, the Court adheres to the plain meaning of 9 U.S.C. § 2 and STAYS this suit pending arbitration.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Coinbase's motion to compel arbitration and STAYS this suit pending arbitration.

**IT IS SO ORDERED.**

Dated: March __5__, 2024

_____
CHARLES R. BREYER
United States District Judge

16